1                   UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MASSACHUSETTS
2

3

4                                      )
     UNITED STATES OF AMERICA,         )
5                                      )
             Plaintiff,                )
6                                      )   Criminal Action
     v.                                )   No. 17-cr-10170-RWZ-1
7                                      )
     GREGORY CARTER,                   )
8                                      )
             Defendant.                )
9                                      )

10

11              BEFORE THE HONORABLE RYA W. ZOBEL
                   UNITED STATES DISTRICT JUDGE
12

13

                            SENTENCING
14

15

                       November 13, 2018
16                        10:01 a.m.

17

18

            John J. Moakley United States Courthouse
19                    Courtroom No. 12
                     One Courthouse Way
20             Boston, Massachusetts 02210

21

22

                    Linda Walsh, RPR, CRR
23                   Official Court Reporter
            John J. Moakley United States Courthouse
24             One Courthouse Way, Room 5205
                 Boston, Massachusetts 02210
25                  lwalshsteno@gmail.com

1    APPEARANCES:

2    On Behalf of the Government:

3          UNITED STATES ATTORNEY'S OFFICE
           By: AUSA Kenneth G. Shine
4          One Courthouse Way, Suite 9200
           Boston, Massachusetts 02210
5          617-748-3686
           kenneth.shine@usdoj.gov

6

7    On Behalf of the Defendant:

8          HEDGES & TUMPOSKY, LLP
           By: Jessica Diane Hedges, Esq.
9          50 Congress Street, Suite 600
           Boston, Massachusetts 02109
10         617-722-8220
           hedges@htlawyers.com

11

12   ALSO PRESENT:  Maria D'Addieco, U.S. Probation

13

14

15                    Proceedings reported and produced
                       by computer-aided stenography
16

17

18

19

20

21

22

23

24

25

1                                    INDEX

2    WITNESS                      DIRECT   CROSS   REDIRECT   RECROSS

3    KIM HANTON

4        By Ms. Hedges                11
         By Mr. Shine                          24
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2            THE CLERK:  This is United States versus Gregory
 3   Carter, and it's Criminal 17-10170.
 4            If I could ask counsel to please identify themselves
 5   for the record, please.
 6            MR. SHINE:  Your Honor, good morning.
 7            Kenneth Shine.  I represent the United States of
 8   America today.
 9            MS. HEDGES:  Good morning, Your Honor.
10            Jessica Hedges for Mr. Carter.  Mr. Carter is present.
11            THE DEFENDANT:  Good morning, Your Honor.
12            THE COURT:  Good morning.  Do be seated.
13            Ms. Hedges, I had a message about one of Mr. Carter's
14   friends who couldn't get in because they didn't have ID.  Has
15   that been resolved?
16            MS. HEDGES:  I had texted --
17            THE COURT:  I put the task to you to resolve it.
18            MS. HEDGES:  Okay.
19            THE CLERK:  They did?  I wish they called me.  I would
20   have gone down there.  I didn't know that.
21            MS. HEDGES:  I had texted --
22            THE COURT:  Has it been resolved?
23            MS. HEDGES:  I don't think it has.
24            THE COURT:  What can we do?
25            MS. HEDGES:  Shall I -- I could run down there or
```

```
 1    maybe -- are the marshals going to respond to someone other

 2    than me if I --

 3              THE COURT:  I don't know.  Lisa, can you take care of

 4    it?

 5              THE CLERK:  Judge, you know what?  I'll call the front

 6    desk.

 7              THE COURT:  That's a good idea.  We'll just do that.

 8              MS. HEDGES:  The person's name is Anthony Mendosa.

 9              THE CLERK:  Okay.

10              MS. HEDGES:  Thank you, Your Honor.

11              THE CLERK:  I just have to -- hold on.

12              COURT OFFICER:  Do you want me to go down and get him,

13    Judge?

14              THE CLERK:  Thank you.  Could you?

15              COURT OFFICER:  Yes.

16              THE COURT:  Thanks very much.

17              THE CLERK:  Oh, I have the number.  Oh, he's gone.

18              MS. HEDGES:  I also have one more letter that I

19    received this morning, if I could just pass that up,

20    Mr. Carter's -- there's a copy for you -- sponsor.  Thanks.

21              MR. SHINE:  I just -- I didn't get the sentencing memo

22    until last night.  I'm just seeing this today, so there's

23    nothing I can say.

24              THE COURT:  You're a fast reader.

25              MR. SHINE:  I could be.
```

1          THE COURT:  While we wait, Ms. Hedges, do you have any

2     witnesses that you want to present?

3          MS. HEDGES:  Your Honor, I do have Kim Hanton, who is

4     the director of the Meridian House, present, if Your Honor

5     wanted to hear from her.

6          THE COURT:  Well, it's up to you.

7          MS. HEDGES:  Yes.  If Your Honor is inclined, yes.

8          THE COURT:  I suppose we can proceed even while we're

9     waiting for whoever.

10          MS. HEDGES:  Yes.

11          THE COURT:  There were a number of objections to the

12     presentence report:  Objection 1, having to do with aliases,

13     and Objection Number 2, having to do with what exactly happened

14     at the time of this robbery.  I will note the objection, but I

15     don't think that I will order Probation to change anything

16     since Mr. Carter isn't so very clear about what did happen.

17          With respect to Objections 3 and 4, which have to do

18     with the interpretation of the guidelines as well as the

19     Supreme Court's pronunciamento on violent crime, those

20     objections are overruled.  I think Probation is correct in its

21     assessment of how to read the guidelines.  So those objections

22     are overruled.

23          And Objection 5, I am not exactly sure what to do

24     about this.

25          You have retrieved our witnesses and attendants.

1 | Thank you very much.

2 |         THE CLERK:  Thank you.

3 |         MS. HEDGES:  Thank you.

4 |         Your Honor, just to be clear, on Objection 4,

5 | regarding the firearm, that is overruled as well?

6 |         THE COURT:  Yes.

7 |         MS. HEDGES:  Okay.

8 |         THE COURT:  And Objection 5 also has to do with prior

9 | criminal history and the alleged inaccuracy of it.  I don't

10 | know what to do about that other than the fact that Probation

11 | relies on CORI and we have relied on it in response as well.

12 | So the objection is noted, but I'm not going to tell them to

13 | change anything.

14 |         Objection 6 is the result of the earlier objections.

15 | To the extent that they were overruled, so is Objection Number

16 | 6.  So that takes care of the objections.

17 |         Now, I think I have Mr. Shine's original sentencing

18 | memo, Ms. Carter's original -- Ms. Hedge's original sentencing

19 | memo as well as her new one which has also attached to it a

20 | number of exhibits and letters, and the exhibits include the

21 | statement about Meridian House and how -- its purpose and how

22 | it works, a letter from Kimberley Wabik, who is an outpatient

23 | clinician and who has assisted Mr. Carter or treated him, and a

24 | letter from the case manager at Meridian House, Mr. Brian

25 | McCarthy, as well as the letter -- a letter from Toye Tavares

1  and Patricia Tavares which came a year ago, but I'm treating it

2  as available today, and a letter from Mister -- another letter

3  for Mr. Carter from Douglas Benton, as well as a letter by

4  Mr. Carter which I assume you assisted with --

5          MS. HEDGES:  I did not --

6          THE COURT:  -- or somebody did.

7          MS. HEDGES:  -- no.

8          THE COURT:  In any event, I have read them all, and I

9  thank you for their submission.

10          Mr. Shine, I will hear your recommendation.

11          MR. SHINE:  Your Honor, the Government, U.S. Probation

12  concluded that Mr. Carter, who stands before you today, is a

13  career offender.  He committed the instant offense while on

14  supervised release for bank robbery.  That particular day he

15  actually went to a Suboxone clinic, received treatment, and

16  then went out and robbed a bank.  I see no other solution to

17  this.

18          Briefly reviewing his record, which I think I have to

19  do.  At age 17 he was convicted of armed robbery; at age 17,

20  another armed robbery; age 21, assault and battery of a police

21  officer with a dangerous weapon; age 25 -- this is 1994 --

22  armed robbery; 1984, armed assault in a dwelling.  His record

23  is prolific.

24          This is exactly -- no, I appreciate the guidelines

25  advisory, but it's a starting point.  I see no reason that

1    we're moving off the starting point.  He has a prolific

2    criminal record with outrageous numbers of violent crimes.

3    This Court has responsibilities to me and to the public at

4    large to prevent a person like Gregory Carter being on the

5    street.

6        He is on supervised release in this Court with Judge

7    Wolf.  He receives a sentence of 151 months, and what does he

8    do when he gets out?  Within months of being out, he goes back

9    on drugs, and he goes back to robbing banks.  This is what he

10   does for a living.  He puts the public at risk.  He puts the

11   tellers at risk.  He puts you at risk.  He puts me at risk.

12   And there's no excuse.  There's just no excuse.

13       I'm a compassionate person, I believe that I sincerely

14   am, but I don't know what to tell you is going to ensure the

15   safety of the public other than a lengthy period of

16   incarceration.  Going through again:  Larceny, assault, assault

17   dangerous weapon, drug offenses, larceny, unlawful possession

18   of drugs, unarmed robbery.  There's no stopping him.  His

19   entire life has been -- and he has had tremendous

20   opportunities, twice having been convicted in this very

21   building, to be on supervised release with the best people that

22   there are, and he still fails.  I don't know what has changed

23   to date that you would think that his situation will change,

24   that he will not go back and commit more crimes.

25       And we say, well, we have supervised release.  If he

commits more crimes, we can always drag him in.  Well, we're

dragging him in.  He's here on supervised release, and he's

committing more crimes, and he still has to deal with Judge

Wolf on that particular matter, where he is facing in the

guidelines, he is facing a 21 to 27 months sentence which is

ordered to be served consecutive to a sentence you provide

here.  I don't see any gray area.

He seems to have done very well, and the Court can

take that -- he has done well during this very limited window

that the Court has extended him to be out.  He was locked up.

He was out on a very limited window with very little structure,

and literally his sentence was thrown against the wall on a

particular day in December of last year why he should be out.

Probation didn't weigh in on it.  The Government didn't weigh

in on it.  It's just a willy-nilly thought process.

I just don't see any other reason.  You have

responsibilities.  He is a career offender.  He continues to

commit crimes.  He does whatever he wants whenever he wants,

and we, the public, you, me, Probation, Ms. Hedges, we are the

ones who pay the price.  He walked into a bank.  He stole

$6,129.  The Government's recommendation is severe.  I

recommend a period of imprisonment of 151 months.  To date he

has done seven months of 151 months.  Not even 10 percent of

his sentence.  He's done seven months of a sentence.  It's

unacceptable.  I'm asking for a period of imprisonment of 151

1    months, supervision for three years to follow, restitution in

2    the amount of $6,129, and a mandatory $100 special assessment.

3    I see nothing in the pleadings, Your Honor, I see nothing which

4    should change or alter your view on this particular matter.

5             Thank you.

6             THE COURT:  Ms. Hedges?

7             MS. HEDGES:  Your Honor, would you like me to call

8    Ms. Hanton now or at the conclusion of my opening?

9             THE COURT:  It's up to you.

10            MS. HEDGES:  Okay.  Ms. Hanton.

11            THE COURT:  We usually do it over there.

12            (Ms. Hanton approaches the witness box.)

13            THE CLERK:  Judge, do you want me to swear her?

14            THE COURT:  Yes.

15            THE CLERK:  Could I just -- thank you.

16            (Witness was sworn.)

17            THE CLERK:  Could you please state your name, spelling

18   your last name for the record, please.

19            THE WITNESS:  Kim Hanton, H-a-n-t-o-n.

20            THE COURT:  Thank you.  Please be seated.

21            KIM HANTON, having been duly sworn by the Clerk, was

22   examined and testified as follows:

23                         DIRECT EXAMINATION

24   BY MS. HEDGES:

25   Q.   Good morning.

1    A.    Good morning.

2    Q.    Where do you work?

3    A.    I work for North Suffolk Mental Health Association.

4          THE COURT:  Could you pull the microphone down a

5    little.

6          THE WITNESS:  Certainly.  Better?

7          THE COURT:  There you go.  Yes.  Thank you.

8    Q.    What is your profession?

9    A.    I'm the director of addiction services for North Suffolk,

10   which means that I oversee the continuum of care for this

11   not-for-profit behavioral health agency.

12         THE COURT:  I'm sorry.  You are director of addiction

13   services?

14         THE WITNESS:  Services, yes.

15         THE COURT:  This is at Meridian House?

16         THE WITNESS:  Meridian House is one of my many

17   programs.

18   BY MS. HEDGES:

19   Q.    When you say "many programs," what other programs do you

20   work with?

21   A.    I have a continuum of care that goes from prevention,

22   intervention, treatment, and aftercare planning.  So there's a

23   variety of treatment within a continuum.

24         THE COURT:  I'm sorry.  What is the name of the outfit

25   that you work for?

1            THE WITNESS:   North Suffolk Mental Health Association.

2   A.   Did I answer your question?

3   Q.   Yes.

4            And how long have you worked in the addiction

5   services field?

6   A.   Over 30 years.  I've been with North Suffolk for 30 years.

7   Q.   And what training do you have in -- supporting you in that

8   work?

9   A.   I have a bachelor's degree in psychology.  I am a licensed

10  alcohol and drug counselor for the Commonwealth of

11  Massachusetts.  And I have many certifications throughout the

12  years in numerous trainings.  I have been sworn in as an expert

13  witness both in Federal- and State-level courts.

14  Q.   And in addition to your work with North Suffolk Mental

15  Health, do you do consulting with other organizations, State or

16  Federal?

17  A.   I actually consult with CARE, Court Assisted Recovery

18  Efforts, for the United States Probation.  And I also consult

19  with many municipalities on post-overdose response teams.  I

20  co-designed the PORT which is actually being implemented in

21  Chelsea, Revere, and Boston for the teams that are going out

22  and doing post-overdose response.  And I'm also on the Board of

23  Health in many communities.  So it's -- there's been a variety

24  of different things that I've done through the years.

25  Q.   So I'm going to focus now a little bit on the Meridian

1  House.   The Meridian House, what is it?

2  A.    Meridian House is a 30-bed coed residential therapeutic

3  community.   It's not -- it's been in operation for over 65

4  years, and what a therapeutic community is is it really works

5  on identifying behaviors and supporting people in changing

6  their behaviors, because the addiction is really only the

7  beginning, and it really takes into account the whole

8  behavioral aspects of folks and really working with them and

9  supporting changing of thinking.

10  Q.    And how does a person who is a resident at the Meridian

11  House progress through the Meridian House?

12  A.    We have a five-level tier system, and how we review it

13  from a clinical perspective is we look at Prochaska and

14  DiClemente stages of change, and that is how the

15  assessment -- that's the assessment tool that's being used

16  throughout this whole process, reviewing people's stages of

17  change and their commitment to change, and then they move on

18  through the tier system which starts off at an evaluationary

19  phase, and you earn privileges by providing responsibilities.

20  Does that answer -- does that answer?

21  Q.    Yes.

22        Do you accept everyone into the Meridian House?

23  A.    No.   You need to have some motivation, you know, to do the

24  work coming in right from the get-go.   Now, what that means

25  sometimes can be, you know, just somebody identifying

1    motivation, but within the evaluationary phase of treatment

2    there, you usually really tease out whether somebody really

3    wants to do the work and is committed to making the changes

4    that are necessary.

5    Q.    And how long does the program typically take?

6    A.    At least a year.

7    Q.    And why is that, that it takes so long?

8    A.    Because we're really reviewing the changing in thinking

9    which is very challenging, and we incorporate so many different

10   pieces into providing this clinical support.  We work with

11   motivational interviewing, we work with CBT, we even do some

12   model rationalization thinking changing.  So it's really, you

13   know, identifying the individual and working with them

14   individually, because everybody brings different things to the

15   table.

16          We also work with MAT, which is medication for

17   addiction treatment.  We do a lot of work with outpatient

18   clinics, and as you heard, Kimberley Wabik is an outpatient

19   therapist that works within our system.  So we treat the person

20   as a whole.  So we really want to help heal them, you know,

21   from the inside out.  So that's why it takes a tremendous

22   period of time.  That's why Meridian House is dedicated to this

23   year-long commitment in keeping people and really working with

24   people during that year.

25          THE COURT:  Excuse me.  You said at least a year.

1   What's the maximum?

2           THE WITNESS:  Well, it depends because it's

3   individualized, and we have to present a clinical case to the

4   funders each time it comes up for re-evaluation.  So it's a

5   nine-months to a year program, but I very rarely see somebody

6   going through all of these stages in nine months.  So once

7   somebody hits a year -- the funders are really looking at us

8   because they really want to ensure that people are really

9   progressing and that they're not just putting their money, you

10  know, to no use.  So it's really working hard at making sure

11  that once they hit that year mark that all the other systems

12  are in place for them.  So when I'm talking about a year, I'm

13  talking about a little over a year, maybe, being at the house,

14  but then really working with them for their aftercare planning

15  and really making them part of our treatment modality.

16          THE COURT:  When is Mr. Carter's year up?

17          THE WITNESS:  I believe it's December 18th, there or

18  around.

19          THE COURT:  And when does the process begin of

20  deciding whether he should stay there longer?

21          THE WITNESS:  It's already in the works.  So

22  Mr. Carter's levels, you know, within the house is he's moving

23  towards putting a plan in place to support his aftercare, which

24  I will make the recommendation, you know, if the Court, you

25  know, asks for that.  Right now where we're at is his case

1   manager is working with him in preparation, as well as the

2   outpatient clinician and the rest of the team in the house.  So

3   this actually really begins probably at Level 3 in the house,

4   that you're really kind of working with, you know, your ideals

5   and what is going to be the best fit for you after you leave

6   this house.  We attach coaches to you.  We work on sober

7   housing that's appropriate.  We help you find whether it's

8   vocational training or education or work, you know, depending

9   on what your level is at, you know, where you're at

10  individualized.  So we've already begun that with Mr. Carter.

11  BY MS. HEDGES:

12  Q.   And speaking specifically about Mr. Carter, in terms of

13  his long-term planning, has he expressed an interest, and have

14  you in working with him and his team expressed an interest in

15  long-term -- continued long-term residential treatment?

16  A.   I believe at this point Mr. Carter -- what we look at for

17  Mr. Carter is to do a transitional plan which would include

18  oversight and sober housing as well as intensive outpatient

19  care, and we really would support a vocational piece to this

20  and an employment piece to this, but treatment is an ongoing

21  piece to your journey when you're healing from the disease of

22  addiction.  So this isn't something one and done.  It's

23  something -- this is a journey for the rest of your life, if

24  you do so commit to this.  And it's the only way you are going

25  to be able to influence change in your thinking is treatment,

```
 1    ongoing treatment.  It will look different at different times

 2    in life, but it is a journey and it is a commitment to change

 3    ongoing.

 4    Q.   And the Meridian House, is it -- are you familiar with

 5    other treatment programs in the city?  Do you have some

 6    familiarity?

 7    A.   Yes, I am.

 8    Q.   Are you aware of Meridian House -- Meridian House's

 9    reputation in terms of the rigor or the challenging nature of

10    that program?

11    A.   Absolutely.  Meridian -- the reason why people are

12    challenged by accepting themselves into Meridian House is

13    because the work that we do is changing the thinking.  And it's

14    really taking little tiny behaviors and bringing them to your

15    attention because, as I stated, we work on a stages-of-change

16    model.  And I don't believe that every treatment facility

17    really scrutinizes the behavioral aspect to the disease of

18    addiction, and it's really an important piece in order to

19    change your thinking.

20          You can stop using drugs and, you know -- and people

21    believe that you're okay at that point, but that's inaccurate.

22    Just not using is never enough.  You have to really look at

23    yourself as a whole human and really determine why you began

24    using from the beginning and incorporate different coping

25    strategies to deal with life on life's terms.
```

1           When somebody has developed substances as a coping

2    strategy through their life, it's very challenging to

3    incorporate changing of thinking, and that's a very, very

4    important piece for us at Meridian House, and that's why we

5    work so closely with very small, little behavioral changes that

6    we hold people accountable for.  So some people out there in

7    this great big world see this as punitive, but we see it as an

8    opportunity because we really do bring people back down, you

9    know, to a primitive level of thinking and really trying to

10   help support changing of thinking.

11   Q.   So, for instance, do residents get demoted, so to speak,

12   back to another level for small deviations like, for instance,

13   going into a store to buy gum when that wasn't on their planned

14   route?

15   A.   Yes.

16   Q.   And, again, why is that?

17   A.   Because that's a small rule within our home, and if you

18   cannot wrap your head around small rules that are very easy to

19   comply with, this greater picture out here can be quite

20   challenging.  So that being said, for those of us that have

21   been committed, you know, to a different type of lifestyle and

22   our thinking is committed to the law and abiding by it, when

23   people are using substances, their thinking is survival, and

24   their addiction wants to survive, so they change that thinking

25   to keep that disease alive.  So you really do have to take a

1    look at these little, tiny behaviors and really have them

2    connect the dots.  Some people don't really understand why is

3    that so bad?  So, I walked into a store.  What does the left

4    have to do with the right?  Well, it has a great deal to do

5    with your thinking, and it's really about taking the time and

6    taking the opportunity to support the changing of thinking.

7    And that's what I think Meridian House does very, very well,

8    and I'm very proud of it.

9    Q.   So you mentioned that you work with outside treatment

10   providers while residents are with you.  When residents

11   graduate from the program, if they graduate from the program,

12   do those outside treatment networks stay in place typically or

13   can they stay in place?

14   A.   Absolutely.  And for the most part, we try to keep it

15   in-house, not outside.  So when we're talking about somebody

16   that's outside treatment -- well, for Mr. Carter, Mr. Carter's,

17   his outpatient treatment is internal.  It is within the North

18   Suffolk system.  So, yes, he gets outpatient treatment in our

19   outpatient clinics, but it's within the North Suffolk system.

20   But even if it's not, yes, we collaborate.  We assign coaches,

21   you know, at a certain level so that they'll follow somebody

22   into their transitional phase of recovery and really work with

23   them, you know, because if they identify their thinking is

24   changing somewhat, you know, they're really able to bring it

25   back.  We also have an alumni group.  We have a transitional

group.  We do a great deal of things to keep people attached to

programming and to really provide the support that's necessary

to combat this disease every day.

Q.   And focusing in on treatment and focusing in on

Mr. Carter, during Mr. Carter's time at the Meridian House, has

he engaged in treatment?  You mentioned outside treatment

providers, but what about within the house; are there groups in

the house?

A.   Yes.  Mr. Carter has engaged in treatment inside the

house, outside the house.  If you'd like, I'll give you an

example of what I've seen, and I think it's important and

that's why I'm here today.  I don't always do this.  Ms. Hedges

knows that and so don't the folks from Meridian House, but

Mr. Carter definitely -- he came into Meridian House in a

contemplative stage of change, which means that he was already

amenable to taking a look at where substances has brought his

decision-making.

        That being said, that doesn't mean you don't go right

back into the ambivalence and denial that exists within the

stages of change.  And there were times that Mr. Carter

struggled in really identifying what we were identifying as

behaviors and why one had to do with the other, but he really,

you know, took this experience and, you know, he took the

punches when they came.

        You know, when Mr. Carter made decisions that he felt

1   at times were punitive in what we provided as a learning

2   experience for him, he took the time to step back and really

3   try to understand, and I have seen it over and over again.

4   Help me understand what this means for me.  I don't get it.

5   You know, what does me going into the store, getting a pack of

6   gum or me allowing somebody who I'm responsible for to walk

7   across the street and talk to somebody else or me accepting,

8   you know, $10 in the community from a friend of mine?  All of

9   these little, tiny behaviors were things that we intervened.

10          And approximately six weeks ago I sat down with

11  Mr. Carter, who was extremely challenged at this time in a

12  very, very painful part of his journey, and I call it my a-ha

13  moment because I received that from Mr. Carter and I don't

14  receive that all the time.  His connect to his behavior just

15  became so apparent visually.  He was able to kind of take a

16  look at things.  He broke down.  He had a really hard time.  He

17  said at that point "This is the most painful experience I've

18  ever had in my entire life, just really understanding what I

19  have to do and the changes that I have to make," and that was

20  an a-ha moment.

21  Q.   And you mentioned that you don't always see that.  So is

22  it frequent that individuals will leave the program after one

23  month, two months, three months?  Is that something that

24  happens?

25  A.   We do not keep people.  It's not a locked facility.  They

1   can leave anytime they want and, you know, our success rate in

2   having people maintain and stay through an entire journey at

3   Meridian House isn't the best record in the state, but for

4   those that do remain and graduate Meridian House, I can testify

5   they are wonderful people in society, and they're giving back

6   tremendously and a number of them work directly for me.

7   It's -- and work for many other agencies.

8   Q.    So those people -- many people who graduated from the

9   Meridian House come back to work with others who are struggling

10  with their addictions --

11  A.    Yes.

12  Q.    -- am I understanding correctly?

13  A.    Yes.

14  Q.    So in your sort of supervision of the Meridian House and

15  working with Mr. Carter, are you supervising other people who

16  are working with Mr. Carter?

17  A.    Yes, that's what I do.

18  Q.    And who are the people who are working on a day-to-day

19  basis with Mr. Carter, not their names but their roles?

20  A.    He has a team.  They consist of recovery coaches, case

21  managers, counselors, and we have licensed clinicians that are

22  in the home as well, and a nurse, a registered nurse is present

23  there as well.

24  Q.    And so, in terms of that sort of future planning with

25  Mr. Carter, you said he's in a stage of doing that right now.

1  Is -- through that process has he or has the team identified a

2  particular program?  Are you that far along or are you just in

3  the initial phases?

4  A.   I don't want to testify to the exact process because that

5  is something that he works directly with his case manager.  I

6  did see that they're working towards identifying appropriate

7  sober housing in the community, you know, with treatment

8  attached that he'll have access to, along with, you know,

9  looking at some work.  I do think that this situation has been

10  something that, you know, has challenged anybody from moving

11  toward and making, you know, stronger decisions on the

12  transitional plan.

13        MS. HEDGES:  I have no further questions.

14        THE COURT:  Any cross-examination?

15        MR. SHINE:  Please.  Thank you, Your Honor.

16                    CROSS EXAMINATION

17  BY MR. SHINE:

18  Q.   So you work pretty closely with Attorney Hedges in this

19  case, correct?

20  A.   Yes.

21  Q.   And you have worked with her on other cases before?

22  A.   Yes.

23  Q.   So this wasn't the first time Attorney Hedges came to see

24  you regarding an individual?

25  A.   No.

1   Q.   When did she first contact you in this case?

2   A.   October, November of last year.

3   Q.   Just before Mr. Carter's sentencing, correct?

4   A.   I'm not really sure.  It was to get Mr. Carter into

5   Meridian House so I'm -- I don't have dates in front of me.

6   Q.   And did she provide you Mr. Carter's criminal record and

7   go over the different things, his background and history?

8   A.   She did.

9   Q.   It's fair to say over the last 45 years he's been in

10  prison at least 10 to 12 different times, correct?

11  A.   Correct.

12  Q.   And in a lot of these situations he receives probation,

13  correct?

14  A.   I don't have it in front of me, but I did see his CORI.

15  Q.   You can assume that a person who is in prison receives

16  some sort of probation and counseling, and that just hasn't

17  seemed to work, correct?

18  A.   I'm not -- like I said, I don't have that CORI in front of

19  me to go over it.

20  Q.   That's common sense.  A person gets out of prison and

21  commits another crime again, having been in prison and on

22  probation and having counseling and drug counseling, and goes

23  back to do the same offense again, you would say it doesn't

24  work?

25  A.   That time didn't work.

1   Q.   And if I were to tell you in 1974 he got 15 years for

2   armed robbery; and in 1975 he got 15 years for armed robbery;

3   1978, he got a year for assault with a dangerous weapon; 1978,

4   he got a year for assault and battery of a police officer;

5   1980, he got convicted of armed robbery, 10 to 15 years; '81,

6   unarmed robbery, 10 to 15 years; '82, armed robbery, 10 to 15

7   years; '83, assault, 10 to 15 years; then in 1992 he was

8   convicted of four counts of bank robbery here in this Court

9   where he received supervised release and a sentence of 90

10  months imprisonment; and then in '03, ten years after he got

11  out, another bank robbery where he received 151 months.  So you

12  would say that counseling and the probationary periods of time

13  hasn't worked?

14  A.   That counseling, apparently that counseling.

15  Q.   That's fair to say, over the last 45 years nothing has

16  worked.  Is it fair to say the only time he doesn't commit

17  crimes, violent crimes on people, like you and me and Judge

18  Zobel and Probation, all these fine people, is when he's locked

19  up in jail?

20       MS. HEDGES:  Objection.

21  Q.   He doesn't commit crimes when he's locked up in jail?

22  A.   I don't know that.

23  Q.   Okay.  So what's going to stop him now from committing

24  more crimes if we let him out?

25       MS. HEDGES:  Objection.

1          THE COURT:  What's the question?

2    Q.   What's going to stop him from committing another crime if

3    he gets released today?

4          THE WITNESS:  Do you want me to answer it?

5          THE COURT:  You can.  If you can answer it, fine.

6          THE WITNESS:  Yes, sure.

7    A.   I think that, as I said, Mr. Carter's changing in his

8    thinking was imperative.

9    Q.   So let me ask you a question because I don't know the

10   answer.  I didn't know you were coming today, and I'm sorry I'm

11   not better prepared.  I wasn't notified until today.

12          What is Suboxone?

13          THE COURT:  What is what?

14          MR. SHINE:  Suboxone.

15   A.   It's a medication for opioid addiction.

16   Q.   And what does it -- so why would a person take Suboxone?

17   A.   If they were addicted to opioids.

18   Q.   What would it do to a person's mindset?  Is it a

19   beneficial drug?

20   A.   It appears to be, but I'm not a doctor, so I'm not going

21   to testify on the brain chemistry of Suboxone.

22   Q.   You don't give Suboxone at your facility?

23   A.   We provide evaluations for Suboxone when determined

24   appropriate.

25   Q.   So if a person is using Suboxone, are they more likely to

1  commit crimes or less likely or you just don't know?

2  A.   I don't.

3  Q.   Mr. Carter, to your knowledge, is he taking Suboxone?

4  A.   No, he is not.

5  Q.   Would it surprise you to know that on the day of this

6  robbery when he walked into a bank, he had just come from a

7  Suboxone clinic?  Did you know that?

8  A.   Well, I heard you say it.

9  Q.   Answer my question.

10  A.   I heard you say it.  That's all I know.

11  Q.   You didn't know that prior to today?

12  A.   No.

13  Q.   For some reason Attorney Hedges didn't talk to you about

14  that or didn't mention that to you?

15  A.   No.

16  Q.   Do you know when he walked into this bank he had a ski

17  mask on, dark pants, gloves?

18  A.   Yes.

19  Q.   You knew that?

20  A.   I did.

21  Q.   What's the purpose of wearing a ski mask, pants, gloves on

22  your hands and fingers?  What's the purpose of that?

23          MS. HEDGES:  Objection.

24          THE COURT:  If she knows, she can tell us.

25  A.   I don't know.

1    Q.   Let's be honest.  It's so the person who you were robbing,

2    the poor bank teller, doesn't know who you are, correct?

3    A.   That could be.

4    Q.   And so you don't leave fingerprints, correct?

5    A.   Once again, that could be.

6    Q.   If you went to jail for a long period of time -- if I told

7    someone I went to jail for a long period of time and it was

8    based on a fingerprint analysis, that person would be thinking

9    about that, gee, I don't want to leave fingerprints, correct?

10   A.   You can say that.

11   Q.   I am going to say it.  And would it be fair to say that's

12   a conscious thought process, not sort of random, crazy thing to

13   do, correct?

14   A.   Do you want me to answer that with my full statement?

15   Q.   Just answer the question I just asked you.  Here's how it

16   works.  I ask questions --

17   A.   Okay.  But I --

18        THE COURT:  If you have a problem, tell me, and I will

19   instruct the witness.

20        THE WITNESS:  I would like to answer it fully, my

21   opinion, because I think that's what he was asking me.  I don't

22   want to just do a yes or no.  Is that okay, Your Honor?

23        THE COURT:  I don't know that the question called for

24   an opinion.

25   Q.   Would you say, yes or no, if a person plans something out,

1   goes to measures, wearing gloves, to obscure their identity,

2   that involved some degree of planning, thought process?

3   A.   Yes.

4   Q.   As opposed to just randomly walking into someplace in a

5   depraved state or a manic state and just robbing somebody;

6   there is a thought process involved?

7   A.   It could be.

8   Q.   Okay.  Well, it's more likely than not.  You wear plastic

9   gloves when you go to rob a bank, you don't want them to get

10  your fingerprints, right?

11  A.   Uh-huh.

12  Q.   And you know he was on supervised release in this very

13  Court when he committed this new crime?

14  A.   I do.

15  Q.   So everything that this Court had been doing to help him

16  apparently didn't work?

17  A.   That appears that way.

18  Q.   And since he's been in your care at Meridian House, has he

19  had any episodes or incidents?

20  A.   Of what?

21  Q.   Testing positive for medication or drugs.

22  A.   No.

23  Q.   Any -- I do note on -- you say on one of your -- he

24  entered a Level 2 and then he deviated from his approved

25  schedule without prior permission.  What does that mean?

1   A.    That was a situation where he went into a store and got a

2   pack of gum.

3   Q.    Did you notify Probation of that?

4   A.    I'm sure.

5   Q.    I'm asking you if you --

6   A.    Me personally, no.  That's the programming.  I don't do

7   that level of care.

8   Q.    So while he's on care, he deviates from the program and

9   goes into a store, correct?  You told him not to do it?

10  A.    Correct.

11  Q.    He did it?

12  A.    He did.

13  Q.    And you didn't notify Probation of that during the

14  release?  Yes or no.

15  A.    I can't answer whether Meridian House did that or not.

16  Q.    If I told you they weren't notified --

17  A.    Excuse me.

18  Q.    If I told you the Court was never notified, would that

19  surprise you?

20  A.    It's not unusual because it's a behavior that we deal

21  with.

22  Q.    In Mr. Carter's case, for the purposes of sentencing, do

23  you think he should do any jail time on this particular case?

24  Your opinion.

25          MS. HEDGES:  Objection.

```
1              THE COURT:  The objection is sustained.
2   Q.   Do you believe in jail?
3              MS. HEDGES:  Objection.
4              THE COURT:  Sustained.
5   Q.   Do you believe in incarceration at any point?
6              MS. HEDGES:  Objection.
7              THE COURT:  Well, that's not really her field.
8              MR. SHINE:  Well, it seems to be because, Your Honor,
9   if I might, with all respect, she seems to have an agenda or --
10  I'm not saying that sarcastically.  I want to know if she
11  believes prison is an appropriate sanction for violent criminal
12  behavior.  If she says no --
13             THE COURT:  I don't know whether that's a question
14  properly addressed in this particular case.  I mean, I'm the
15  one who has to decide that.
16             MR. SHINE:  I understand that.  I know you are
17  listening to me.  I know you are listening to Attorney Hedges,
18  and I know you are listening to this witness here.  I just want
19  to know this person's opinion.
20             THE COURT:  But her opinion on that is not
21  particularly relevant to the reason she was called, which has
22  to do with how Meridian House deals with its constituents, its
23  residents.
24             MR. SHINE:  But if she were to answer the question
25  hypothetically and say "I don't believe prison is ever
```

1    appropriate for anybody," I think that's something you should

2    know.

3            THE COURT:   Should I know that?

4    A.   That's not accurate.

5    Q.   I asked you a question.   Do you think it's appropriate in

6    any situation?

7    A.   Yes.

8    Q.   Is it appropriate in this situation?

9    A.   No.

10   Q.   Why is that?

11   A.   Because I do believe that Mr. Carter has made some

12   tremendous changes in his thinking, and I just think that right

13   now is an opportunity for Mr. Carter to show society.

14   Q.   What happened the last 45 years?

15   A.   I don't believe the treatment was appropriate.

16   Q.   So twice he's been on probation with supervised release in

17   this Court, this very building, for bank robbery, 19 months and

18   151 months, and he has not had the proper treatment?

19   A.   It appears that way.

20   Q.   But you are able to?

21   A.   It appears that we have.

22           MR. SHINE:   Nothing.

23           THE COURT:   Anything else, Ms. Hedges?

24           MS. HEDGES:   No, Your Honor.

25           THE COURT:   Thank you very much, Ms. Hanton.

1          Anybody else?

2          MS. HEDGES:  No, Your Honor.

3          THE COURT:  I will hear the defense recommendation,

4    please.

5          MS. HEDGES:  Your Honor, our recommendation is time

6    served, which is the time that Mr. Carter has been in custody

7    before his prior sentencing date, to be followed by a long term

8    of supervised release.

9          THE COURT:  We have a problem with that.

10         MS. HEDGES:  Yes.

11         THE COURT:  The statute only allows a three-year

12   period of supervised release.

13         MS. HEDGES:  Yes.

14         THE COURT:  Anything above that would be illegal.

15         MS. HEDGES:  So, well, a three-year period of

16   supervised release is in fact a long term of supervised

17   release.

18         THE COURT:  There is one possibility, if one were to

19   go down this road, which is probation, not to give him credit

20   for time served but probation could be five years.

21         MS. HEDGES:  Yes.  Well, that possibility, because it

22   would allow for a longer term of supervision, that may be a

23   better plan because it would allow for a long sustained period

24   of supervision.  We would also ask that he be ordered to engage

25   in intensive drug treatment during this period.  We would also

1   ask that he be ordered to participate in the Restorative

2   Justice Program that is now offered by Probation.  I think the

3   next one is in March of this year.

4          THE COURT:  I'm sorry.  Which program?

5          MS. HEDGES:  The Restorative Justice Program that is

6   offered by Probation.  I think in Mr. Carter's case --

7   Mr. Carter actually has talked in the past about thinking about

8   the harms he's caused the people, like tellers, and I think

9   that that would be an opportunity for him to delve more deeply

10  into that work.

11         And to be clear, Your Honor, there are a few things

12  that the Government and -- many things, actually, that the

13  Government and we agree on, and that is that we must do what we

14  can do, that it is Your Honor's job to protect the public.  The

15  other thing that we agree on is that Mr. Carter has had -- to

16  use the Government's word -- a prolific criminal record.  He

17  was criminalized from the time he was eight years old when he

18  first started with the crime.  He was then charged with another

19  crime when he was ten years old for robbing people for small

20  amounts of money.  He was then sentenced by a state court judge

21  for 15 years to go to an adult prison for a crime he committed

22  when he was 15 years old.  Thankfully he was paroled, but not

23  before he was sent as a teenager to prison with adults.

24         So, yes, it is this Court's job to protect the public.

25  One thing that we disagree on, and one thing that seems to be

1  in Mr. Carter's case, when Your Honor thinks about

2  individualized sentencing, one thing that seems to be

3  abundantly clear is that when you think about the purposes of

4  punishment, what was done historically relative to Mr. Carter

5  has not worked.  It has not worked specifically to deter him.

6  It has not worked to rehabilitate him.  It has only put him in

7  environments which have accelerated his misery, frankly,

8  exacerbated his disease, and made him more of a public safety

9  threat.

10        So the choice that confronts Your Honor is a very

11 difficult one, which is a choice between sort of incapacitating

12 -- and that for purpose of punishment is a real one --

13 incapacitating Mr. Carter for, he's 61 years old, for the rest

14 of his life.  Or a choice of adopting the path that he has

15 given himself over to that appears to be for the first time

16 actually protecting the public, which is -- and it is something

17 that he has never done before, which is long term, intensive

18 residential treatment in a community of people who are

19 similarly struggling and similarly committed to addressing

20 their disease.  And this, when we talk about protection of the

21 public, is what is working.

22        Mr. Carter -- Your Honor took a risk when we came to

23 sentencing on the first day and -- on the first sentencing date

24 and I asked Your Honor to continue the sentencing.  Given his

25 history, he could have -- yes, he could have walked away from

the program.  In fact, you know, that was possible, maybe even probable, because when we're under the -- when people are under the -- using their disease as thinking for it, then they aren't thinking about that warrant in advance.  They are thinking about satisfying their craving, but he didn't.

And as I said in my memo, he made a choice.  I think it's for 307 days, 307 days he made a choice to stay in that program, in a program where he can't even speak to the counselors, he can't argue with the counselors without asking for permission.  This is a grown man who has to ask for permission to go into a store to get gum.  And he stayed with that.  And he did the work and he didn't leave, and he hasn't committed another crime, and that process -- and we've heard from the director of the program who spoke to him, who knows him individually, that she saw him break down and do the work and confront the harms that he's done.  That is not going to happen if he goes to jail for 151 months.  That is not going to happen if he goes to jail for three years.

What is going to happen is the same thing that has always happened when we sent him to jail.  He's going to be put back in an environment where he has little treatment.  He's going to be put back in an environment where he's stigmatized as a criminal, and he's going to be put back in an environment where he's marginalized from his support community.  His community, Your Honor, who is here today, are his treatment

1   providers and the people he lives with every day.  And these

2   are participants in the program who are all here, who

3   petitioned the program, in fact, in our exhibit to the latest

4   sentencing memo, who petitioned the program to come and support

5   him.  And it's not easy to live day to day to day with other

6   people who are struggling with their disease.  I'm sure

7   everyone doesn't get along all the time, right?  So, but

8   they're here.  These are the people he lives with.  These are

9   the people he's working with.

10          So we would ask Your Honor to continue to allow

11  Mr. Carter to continue the path that he's on, the path that is

12  serving the purposes of punishment, that is protecting the

13  public, that is protecting the public more than any other path

14  that he's been on in the past.  And if Your Honor believed that

15  a sentence of five years of probation is appropriate and will

16  advance for purposes of punishment, then we would agree with

17  that determination and ask Your Honor to allow Mr. Carter to

18  proceed in his work.

19          Thank you.

20          THE COURT:  Thank you.

21          Mr. Carter, do you wish to say anything?  I have read

22  your letter.  If it's easier for you to do this sitting down,

23  you are welcome to sit down.

24          THE DEFENDANT:  That's okay.

25          First, I want to thank Your Honor for giving me the

1    opportunity that you did.  I am extremely grateful for that.  I

2    have some things today that I'm very not proud, you know, and,

3    you know, I know I can't change the past, but, you know, for

4    that I am truly sorry.

5           I just want you to know this has been the hardest work

6    I've ever done.  You know, it is truly much harder than sitting

7    in prison for me.  I've had to confront some things in my past

8    and in my life today, not only my disease but also confront the

9    fear that I have put in others over the years and the harm that

10   I must have caused.  I now know that in order to never harm

11   myself and, most important, others again, I will need the

12   constant support of people committed to sobriety and change.

13          It is the first time in my life that I have

14   surrendered to this reality.  You know, it is my hope that, you

15   know, that I can continue to do this so that I can not only

16   continue to heal myself but also repair some of the harm that I

17   caused humanity.

18          I want to thank you again, Your Honor, for this

19   opportunity, and, you know, part of -- the Meridian House is

20   just -- I can't speak highly enough about this program.

21   It's -- and I don't -- I don't -- I really don't know how that

22   house was chosen for me, but that house has changed me in ways

23   that even I can't believe.  It's just -- I don't know.  I just

24   want to thank Kim, thank all of my support here.  You guys are

25   awesome.  I love every one of them.  You are my family over

1    there.  I just can't thank you guys enough.  You guys have

2    changed me.  You guys are just awesome, and I love all of you

3    guys and you know that.

4         COURTROOM GALLERY:  We love you, too.

5         THE DEFENDANT:  I don't know.  I wish I could explain

6    to you how the Meridian House works, but I can't.  It's just a

7    process that is truly amazing, and I'm a person who I have came

8    to trust in that process because it has worked for me.  I don't

9    know.  I'm just truly grateful today, Your Honor.

10        And, you know -- and, again, I can't say how sorry I

11   am for the things I've done.  You know, I had to take a serious

12   look at that, and I just -- I work on it every day.  I continue

13   to work on it.

14        Thank you.

15        THE COURT:  Thank you.  You know, sentencing is

16   incredibly hard, and the Government is right to talk about

17   punishment, and the statutes and the rules are right to

18   consider punishment.  But it seems to me that Mr. Carter --

19   well, Mr. Carter has been blessed in a number of ways, not only

20   through Meridian House but through his attorney who has, I

21   think, done much to make Meridian House a possibility for you,

22   who not only does a fantastic job of representing criminal

23   defendants but in fact runs our Criminal Justice Program for

24   the Court.  So we are grateful to her for many of the roles

25   that she plays that I think in the end will make us better

1    sentencers, if you will, than we otherwise would be.  It's a

2    difficult and onerous task for sure.

3          From what I can gather from your history, from the

4    papers that have been given to me, the probation report and so

5    on, you have had a disease for a very long time.  You have been

6    addicted to drugs and then committed crimes later on in your

7    life, bank robberies, in order to feed that disease.  And that

8    in turn has resulted in many convictions and very long prison

9    sentences including, I must say, a shameful sentence of 15

10   years when you were 15 or 17 years old.

11         I think Mr. Shine is right, that everything this Court

12   has been doing didn't work.  So why should we repeat what

13   didn't work?  And I'd also believe that to the extent that one

14   of my jobs is to protect the public, the public is better

15   protected by providing you with a continuing opportunity to

16   improve yourself, to continue your treatment, to continue your

17   path to better mental health, and to become at the age of 61 a

18   fully functioning human being.

19         So everybody agrees the public should be protected.  I

20   think the sentence I have in mind will protect the public.  It

21   is agreed that prison hasn't worked so why repeat that again.

22   And punishment can take many forms.  It is not merely sitting

23   in a jail.  It can be the hard work of learning about yourself

24   that Ms. Hanton talked about and even the harder work to change

25   oneself.  Sometimes age helps, and perhaps your being 61 years

1    old has made it in part easier for you to take that path rather

2    than continuing with the way you have been.

3         I note, also, that the sentence recommended by the

4    Government would cost us somewhere in the vicinity of $430,000

5    at today's prices.  That would almost certainly go up.  So I

6    hope that this period of probation that you have had will set

7    you on a path where you will not again rob banks, where you

8    will not go back to drugs.

9         I sentence you to a term of probation of five years.

10   That means that, in a sense, you don't get credit for the time

11   that you have served, but you would, if you go back to jail,

12   then you would probably get that back, but a five-year period

13   of probation.  There are a number of conditions.  There are the

14   regular conditions, the standard conditions, and the special

15   conditions including that you shall stay at Meridian House and

16   maintain your adherence to the rules and regulations of that

17   place until they decide, I assume in conjunction with you, that

18   you are finished with that.

19        Once you are done at Meridian House -- when you are

20   discharged at Meridian House, you shall live in a sober house

21   as they help you to find and as Probation approves.  You shall

22   participate in the Restorative Justice Program that is a

23   program of this Court, and you shall maintain treatment as

24   directed by Probation when you are no longer under the thumb of

25   Meridian House or any other such institution.

1          You shall not use any illegal drugs of any kind.  You

2   shall not possess any such drugs, and "possession" doesn't mean

3   you own them.  You can't hold them in your hot little hand.

4   You can't tell somebody what to do with theirs.  You shall not

5   possess, you shall not use any illegal drugs.  You may not

6   possess or own any guns of any kind.  You shall not rob any

7   banks during this time or ever again.  What did I miss?

8          U.S. PROBATION:  Your Honor, we would add there's an

9   order of restitution to the Santander Bank in the amount of

10  $6,129.

11         THE COURT:  Yes, that is included.  And a special

12  assessment of $100, also.  You have to pay that.

13         U.S. PROBATION:  Correct.

14         And, Your Honor, we would ask for the standard

15  condition associated with restitution, he has to pay the

16  balance of restitution according to a court-ordered repayment

17  schedule.  He is prohibited from incurring credit charges or

18  opening additional lines of credit while that's outstanding.

19  He shall provide the Probation Office with the request for

20  financial information which we share with the U.S. Attorney's

21  Office.

22         And, Your Honor, we would recommend that the period of

23  sober living would be 12 months that you have ordered, and if

24  for some reason the treatment providers and Mr. Carter decide

25  that 12 months is too long, they can certainly come back --

1          THE COURT:  You mean 12 months from now?

2          U.S. PROBATION:  12 months following his discharge

3    from Meridian House.  So he would be required to reside in a

4    sober living residence for 12 months following discharge of

5    Meridian House.  Certainly they can come and petition the Court

6    to change that if that changes, but that would provide

7    Mr. Carter with even an additional period of stability.

8          THE COURT:  Okay.  So you shall pay restitution in the

9    amount of, what is it, $6,129?

10          U.S. PROBATION:  And twenty-nine dollars.

11          THE COURT:  And you shall pay that in such

12    installments as Probation directs which they will determine

13    after they get going and find out what kind of jobs you can get

14    and how much money you can earn.  You shall also pay a special

15    assessment of $100 which the statute requires, and you shall

16    live in a sober house or equivalent after you are released from

17    discharge from Meridian House for a period of a year, which may

18    be subject to change if indeed you no longer need it, and

19    Probation will make that decision initially.  You also can come

20    back to the Court and ask the Court if you do not agree with

21    their decision.

22          To the extent -- during the period of time that you

23    still owe any part of the restitution, you shall not open any

24    bank accounts or credit charges -- credit accounts without

25    first getting permission from Probation.  If they need

1   financial information from you, you shall give it to them.  And

2   what else?

3          U.S. PROBATION:  And we share that information with

4   the --

5          THE COURT:  Yes.  Understand they will notify the U.S.

6   Attorney's Office, which has a collection part, so long as you

7   owe any money and if you are not paying.  I think that's it.

8          There was no plea agreement in this case.  You have a

9   right to appeal from the judgment of this Court, and I would

10  ask Ms. Hedges to file such a notice of appeal on your behalf.

11  And the Government's objections to the sentence are noted.  It

12  knows what to do with that.

13         I wish you well, and I thank all of you for your

14  informed and passionate presentations.

15         MS. HEDGES:  Thank you, Your Honor.

16         THE COURT:  Thank you.  Court is in recess.

17         (Adjourned, 11:04 a.m.)

18

19

20

21

22

23

24

25

1          CERTIFICATE OF OFFICIAL REPORTER

2

3          I, Linda Walsh, Registered Professional Reporter

4    and Certified Realtime Reporter, in and for the United States

5    District Court for the District of Massachusetts, do hereby

6    certify that pursuant to Section 753, Title 28, United States

7    Code that the foregoing is a true and correct transcript of the

8    stenographically reported proceedings held in the

9    above-entitled matter and that the transcript page format is in

10   conformance with the regulations of the Judicial Conference of

11   the United States.

12               Dated this 29th day of November, 2018.

13

14

15               /s/ Linda Walsh_____

16               Linda Walsh, RPR, CRR

17               Official Court Reporter

18

19

20

21

22

23

24

25